**FILED**

JUN -5 2019

**THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. **19 CR 474** |
| v. | ) | |
| | ) | Violations: Title 18, United States |
| YALE SCHIFF | ) | Code, Sections 1344 and 1028A |

**JUDGE DOW**

**MAGISTRATE JUDGE KIM**

## COUNT ONE

The SPECIAL JANUARY 2019 GRAND JURY charges:

1.     At times material to this Indictment:

a.     Defendant YALE SCHIFF purportedly held management positions at various companies in the mortgage lending industry.

b.     C.S. was SCHIFF's relative, and the legal owner of the property located at 1000 W. Adams Street in Chicago, Illinois ("Adams Street Property") and the property located at 2460 Forest Glen Trail in Riverwoods, Illinois ("Riverwoods Residence").

c.     D.I. was SCHIFF's business associate.

d.     I.S. was SCHIFF' relative.

e.     A.S. was SCHIFF's relative.

f.     The Yale Schiff Fake Identity was an identity using the name Yale Schiff with a date of birth and a social security number that did not belong to SCHIFF, and false employment and income information.

g.     The Jeff Kaplan Fake Identity was an identity using the name Jeff Kaplan with a social security number that belonged to a real person not named

Jeff Kaplan, a date of birth not known to be associated with any person named Jeff Kaplan, and fictitious employment and income information.

h.     The Sam Rosen Fake Identity was an identity using the name Sam Rosen with a social security number that belonged to a real person not named Sam Rosen, a date of birth not known to be associated with any person named Sam Rosen, and fictitious employment and income information.

i.     The J.G. Stolen Identity was an identity using the full name, date of birth, and social security number of J.G., a deceased real person known to SCHIFF, and false employment and income information.

j.     The L.I. Stolen Identity was an identity using the full name, date of birth, and social security number of L.I., a relative of D.I. and a real person known to SCHIFF, and false employment and income information.

k.     American Chartered Bank ("American Chartered"), Bank of America ("BOA"), Bank One, BMO Harris Bank, BMW Bank of North America ("BMW Bank"), Chicago Bancorp, Comenity Bank, Countrywide Home Loans ("Countrywide"), Discover Bank, GMAC, IndyMac Bank, JP Morgan Chase Bank ("Chase Bank"), Synchrony Bank, TD Bank, US Bank, Washington Mutual Bank ("WAMU") and Wintrust Mortgage were financial institutions insured by the Federal Deposit Insurance Corporation.

l.     Digital Federal Credit Union ("Digital Federal"), Navy Federal Credit Union ("Navy Federal") and Pentagon Federal Credit Union ("Pentagon

Federal") were financial institutions insured by the National Credit Union Administration.

m.     Financial institutions, including those identified in the previous two subparagraphs, required loan applicants to provide truthful information, including the applicant's identity, financial condition, employment, income, liabilities, source of down payment funds, and encumbrances on collateral, all of which was material to the financial institutions' approval, terms, and funding of loans.

n.     Mortgage lenders often sold and or assigned loans to other lenders and institutions ("successors"). Lenders disclosed that the mortgage loans could be sold or assigned and the likelihood that the mortgage loans would be sold or assigned. The information provided in loan applications and supporting documents, including the borrower's identity, financial condition, employment, income, liabilities, source of down payment funds, and encumbrances on collateral, was material to the successors' decision to purchase or service the mortgage loans.

2.     Beginning in or around 2004 and continuing to in or around 2018, in the Northern District of Illinois, and elsewhere,

YALE SCHIFF,

defendant herein, with others known and unknown to this grand jury, knowingly devised and participated in a scheme to defraud a financial institution and to obtain money, funds, credits, assets and other property owned by and under the custody and control of a financial institution, by means of materially false and fraudulent

pretenses, representations and promises, which scheme is further described in the following paragraphs.

3.      It was part of the scheme that SCHIFF and others made materially false and fraudulent representations to financial institutions to obtain millions of dollars in the form of mortgage loans, vehicle loans, lines of credit, and credit card accounts.

4.      It was further part of the scheme that SCHIFF and others filed and caused the filing of false releases of mortgages and liens on real property and vehicles held as collateral for loans, thereby making it appear that the title to the collateral was free and clear and allowing SCHIFF to fraudulently obtain additional loan proceeds or to sell the collateral and retain the sales proceeds, without payment to prior mortgage holders or lienholders.

5.      It was further part of the scheme that SCHIFF and others fraudulently used fictitious identities, through combinations of names, including fake names such as Jeff Kaplan and Sam Rosen, social security numbers, and dates of birth, to obtain loans and credit from financial institutions. In connection with SCHIFF's use of fictitious identities, SCHIFF used a fake Illinois driver's license that bore the name Jeff Kaplan with SCHIFF's likeness and an address of a residence previously used by SCHIFF, and a fake Illinois driver's license that bore the name Sam Rosen with D.I.'s likeness and an address of a residence used by A.S.

6.      It was further part of the scheme that SCHIFF and others fraudulently used the identities of other real persons, namely L.I. and J.G., without authorization from those persons, to obtain loans and credit from financial institutions.

## Fraudulently Obtained Mortgage Loans

7.      It was further part of the scheme that SCHIFF fraudulently obtained and caused to be obtained mortgage loans secured by real property through false statements in loan applications and false releases of mortgages on the collateral, including as follows.

### 910 W. Madison Street, Unit 802, Chicago

8.      It was further part of the scheme that in or around November 2002, SCHIFF purchased the property located at 910 W. Madison Street., Unit 802, Chicago, Illinois ("Madison Street Property") with financing that included a loan from BOA of approximately $270,000 secured by a mortgage on the Madison Street Property.

9.      It was further part of the scheme that in or around July 2003, SCHIFF obtained a home equity line of credit (HELOC) from Bank One for approximately $292,000, using the Madison Street Property as collateral, and shortly thereafter, obtained advances on the HELOC in the amount of approximately $270,000, which he used to pay off the original mortgage loan from BOA on the Madison Street Property.

10.     It was further part of the scheme that in or around June 2005, SCHIFF filed or caused to be filed with the Cook County Recorder of Deeds a release that falsely stated that the HELOC obtained from Bank One, later known as Chase Bank, was paid in full and that the lien was thereby released when, as SCHIFF knew, the loan was not paid in full and the lien had not been released.

11.     It was further part of the scheme that in order to conceal the scheme, including the false and fraudulent release of the lien, SCHIFF continued to pay on the Bank One/Chase Bank HELOC after he caused the removal of the lien.

16 S. Aberdeen Street, Unit 9, Chicago

*Chicago Bancorp/Countrywide Home Loans*

12.     It was further part of the scheme that in or around March 2004, SCHIFF purchased the property located at 16 S. Aberdeen Street, Unit 9, Chicago, Illinois ("Aberdeen Street Property") for approximately $520,000, with financing through two loans from Chicago Bancorp, a first loan for approximately $416,000 and a second loan for approximately $52,000, both using the Aberdeen Street Property as collateral, with the second mortgage subordinate to the first. Subsequently, Chicago Bancorp assigned both loans to Countrywide.

13.     It was further part of the scheme that SCHIFF obtained additional financing using the Aberdeen Street Property as collateral, and used that financing to pay off the mortgages from the Chicago Bancorp/Countrywide loans, with the remaining loan proceeds disbursed to SCHIFF.

14.     It was further part of the scheme that in or around July 2005, SCHIFF obtained from Chicago Bancorp a HELOC for $125,000, using the Aberdeen Street Property as collateral, which Chicago Bancorp subsequently assigned to GMAC.

15.     It was further part of the scheme that in or around August 2005, SCHIFF filed or caused to be filed with the Cook County Recorder of Deeds a release that falsely claimed that the Chicago Bancorp/GMAC HELOC was paid in full and

that the lien was released when, as SCHIFF knew, the HELOC was not paid in full and the lien had not been released.

16.     It was further part of the scheme that in order to conceal the scheme, including the false and fraudulent release, SCHIFF continued to make payments on the July 2005 Chicago Bancorp/GMAC HELOC after causing the release of the lien.

*Additional Loans Using Aberdeen Street Property as Collateral*

17.     It was further part of the scheme that SCHIFF obtained other loans collateralized by the Aberdeen Street Property, including the following: (a) in or around July 2005, SCHIFF obtained from Quicken Loans two refinancing loans for the Aberdeen Street Property, one for approximately $480,000 (subsequently assigned to IndyMac Bank) and one for approximately $120,000 (subsequently assigned to BOA); (b) in or around December 2005, SCHIFF obtained from BMO Harris Bank a HELOC for approximately $385,000; (c) in or around May 2006, SCHIFF obtained from Chicago Financial Services a loan for $350,000 (subsequently assigned to US Bank); and (d) in or around December 2006, SCHIFF obtained from WAMU a HELOC for approximately $468,000.

18.     It was further part of the scheme that SCHIFF obtained these loans described in the preceding paragraph through false information, including falsely stating in his loan application submitted to Chicago Financial Services/US Bank that the loan with Quicken Loans/IndyMac Bank was secured by a property located at 1523 N. California Avenue, Chicago, Illinois and that the BMO Harris Bank HELOC was secured by a property located at 4601 W. Touhy Avenue, Lincolnwood, Illinois, and

falsely stating in his loan application submitted to WAMU that the loan with Quicken Loans/IndyMac Bank was secured by a property located at 2055 W. Ohio Street, Chicago, Illinois, and that the BMO Harris Bank HELOC was secured by a property located at 1000 W. Adams Street, Chicago, Illinois when, as SCHIFF knew at all times, both the Quicken Loans/IndyMac Bank loan and the BMO Harris HELOC were secured by the Aberdeen Street Property.

19.     It was further part of the scheme that on multiple occasions, SCHIFF filed or caused to be filed with the Cook County Recorder of Deeds false documentation purporting to release various mortgages and liens on the Aberdeen Street Property, and claiming that various loans were paid in full when such loans were not paid in full, including:  (a) in or around October 2005, a release that falsely claimed that the Quicken Loans/IndyMac Bank loan (for approximately $480,000) was paid in full and that the Quicken Loans/IndyMac mortgage on the Aberdeen Street Property was released; (b) in or around April 2006, a release that falsely claimed that the Quicken/BOA loan (for approximately $120,000) was paid in full and that the Quicken/BOA mortgage on the Aberdeen Street Property was released; (c) in or around April 2006, a release that falsely claimed that the BMO Harris Bank HELOC had been paid in full and that the BMO Harris Bank lien on the Aberdeen Street Property was released; and (d) in or around September 2006, a release that falsely claimed that the Chicago Financial Services/US Bank loan had been paid in full and that the Chicago Financial Services/US Bank mortgage on the Aberdeen Street Property was released; and (e) in or around November 2007, a release that falsely claimed that the WAMU

HELOC had been paid in full and that the WAMU HELOC lien on the Aberdeen Street Property was released.

20.   It was further part of the scheme that in or around August 2008, SCHIFF sold the Aberdeen Street Property for approximately $525,000, and received approximately $484,000 in sale proceeds, which he kept for his own benefit, without paying on any of the outstanding loans secured by the Aberdeen Street Property.

21.   It was further part of the scheme that in order to conceal the scheme, including the false and fraudulent releases on the Aberdeen Street Property, SCHIFF continued to make payments on certain of these loans even after falsely causing the release of the mortgage or lien secured by Aberdeen Street Property, and on at least one loan, after the sale of the Aberdeen Street Property.

### 1000 W. Adams Street, Unit 816, Chicago

22.   It was further part of the scheme that in or around September 2006, SCHIFF purchased the Adams Street Property for approximately $269,000, financed by a loan from Chicago Financial Services for approximately $242,000, using the Adams Street Property as collateral. Chicago Financial Services subsequently assigned service of the loan to GMAC.

23.   It was further part of the scheme that in or around December 2007, SCHIFF filed or caused to be filed with the Cook County Recorder of Deeds a release that falsely claimed that the Chicago Financial Services/GMAC loan was paid in full and thereby released the mortgage, when, as SCHIFF knew, the loan was not paid in full and the mortgage had not been released.

24. It was further part of the scheme that in or around April 2009, SCHIFF and C.S. formed the 1000 W. Adams LLC as the only two members and managers of the LLC, and SCHIFF then transferred the Adams Street Property to the 1000 W. Adams LLC; then, in or around November 2009, the 1000 W. Adams LLC transferred the Adams Street Property to C.S.

25. It was further part of the scheme that in or around November 2009, SCHIFF and C.S. obtained a loan in her name from Wintrust Mortgage to refinance the Adams Street Property, in the amount of approximately $188,250, using the Adams Street Property as collateral. The loan required proof that the property be "owned free and clear."

26. It was further part of the scheme that in or around November 2009, SCHIFF submitted or caused to be submitted to Wintrust Mortgage a fictitious letter purportedly from GMAC to SCHIFF referencing the prior mortgage on the Adams Street Property and stating, "This is to confirm that your home mortgage loan with GMAC has been paid in full and is now closed effective October 10, 2007," when, as SCHIFF knew, the letter was not from GMAC and the loan was not paid in full.

27. It was further part of the scheme that in or around November 2009, Wintrust Mortgage issued in excess of $160,000 in mortgage loan proceeds to C.S., who transferred approximately $122,000 of the loan proceeds to a bank account controlled by I.S., who then provided a portion of the loan proceeds to SCHIFF.

<u>2057 W. Ohio Street, Chicago</u>

28.     It was further part of the scheme that in or around April 2007, SCHIFF purchased the property located at 2057 W. Ohio Street, Chicago, Illinois ("the Ohio Street Property"), from Ohio Development Group LLC, of which SCHIFF was one of two managers/members.

29.     It was further part of the scheme that in or around April 2007, SCHIFF obtained from American Chartered a loan for approximately $375,000 to finance the purchase of the Ohio Street Property using that property as collateral. SCHIFF submitted a loan application to American Chartered falsely stating, among other things, that SCHIFF had only one outstanding mortgage on the Aberdeen Street Property, namely the WAMU HELOC when, as SCHIFF knew, he then had multiple outstanding loans secured by the Aberdeen Street Property, including the Chicago Bancorp Loan, the Quicken Loans/IndyMac Bank loan, the BMO Harris Bank HELOC, and the Chicago Financial Services/US Bank loan.

<u>2460 Forest Glen Trail, Riverwoods</u>

30.     It was further part of the scheme that in or around June 2015, SCHIFF and C.S. obtained a loan in her name from Chase Bank for approximately $678,000 to purchase the Riverwoods Residence, for C.S. and SCHIFF to reside, using the Riverwoods Residence as collateral.

31.     It was further part of the scheme that in or around April 2015, as part of the loan application process, SCHIFF falsely represented to Chase Bank that the Ohio Street Property "had no current mortgage" when, as SCHIFF knew, American

Chartered had a lien on the Ohio Street Property and that, on or about April 6, 2009 American Chartered had initiated foreclosure proceedings on the Ohio Street Property which were still pending as of the date of SCHIFF's false representations to Chase Bank.

32.     It was further part of the scheme that in or around May 2015, SCHIFF caused fraud proceeds from bank accounts opened by SCHIFF in the name of fictitious identities, including the Sam Rosen Fake Identity and the Jeff Kaplan Fake Identity, to be deposited into C.S.'s bank account and used as part of the financing for the down payment for the Riverwoods Residence.

### Fraudulently Obtained Vehicle Loans

33.     It was further part of the scheme that SCHIFF fraudulently obtained vehicle loans from financial institutions through false statements, including the use of false and stolen names and personally identifying information, in vehicle loan applications and through fictitious releases falsely asserting that such loans had been paid in full.

34.     It was further part of the scheme that in or around March 2013, SCHIFF, using the Yale Schiff Fake Identity, obtained a loan of approximately $53,800 from BMO Harris to purchase a 2014 Jeep Grand Cherokee, secured by a lien on the vehicle in favor of BMO Harris.

35.     It was further part of the scheme that in or around June 2014, SCHIFF submitted or caused to be submitted a letter to the Illinois Secretary of State falsely purporting to be from BMO Harris and falsely stating that the BMO Harris loan was

paid in full, and requesting that the Illinois Secretary of State issue a duplicate and corrected title that removed BMO Harris as the lienholder on the Jeep when, as SCHIFF knew, the BMO Harris loan had not been paid in full and the lien had not been released.

36. It was further part of the scheme that in or around June 2014, SCHIFF caused a company named "Funding Choices" to be added as a lienholder on the fraudulently obtained duplicate title for the Jeep, then caused "Funding Choices" to sell the vehicle for approximately $41,000 and deposited the sale proceeds into a bank account controlled by SCHIFF.

37. It was further part of the scheme that in or around February 2017, SCHIFF, using the Jeff Kaplan Fake Identity, obtained financing from BMW Bank in the amount of approximately $92,000, to purchase a 2017 BMW X5 in the name of Jeff Kaplan and Axis Development Corp, secured by a lien on the vehicle in favor of BMW Bank.

38. It was further part of the scheme that in or around May 2017, SCHIFF submitted or caused to be submitted to the Illinois Secretary of State a letter falsely purporting to be from BMW Bank and false stating that the loan from BMW Bank had been paid in full and requesting that BMW Bank be removed as a lienholder on the title of the BMW when, as SCHIFF knew, the BMW Bank loan had not been paid in full and the lien had not been released.

39.     It was further part of the scheme that in or around June 2017, SCHIFF attempted to sell the BMW at an auction, but BMW Bank prevented the sale and recouped the vehicle.

40.     It was further part of the scheme that in or around May 2015, SCHIFF, using the Sam Rosen Fake Identity, including the fake Illinois Driver's license associated with that identity bearing a likeness of D.I., obtained from Digital Federal a loan of approximately $47,000 to purchase a 2015 Lexus RX350 from the Jeff Kaplan Fake Identity, secured by a lien on the vehicle in favor of Digital Federal.

41.     It was further part of the scheme that in or around May 2015, Digital Federal issued the loan proceeds for the purchase of the Lexus to the Sam Rosen Fake Identity by a check for $47,000 made payable to Jeff Kaplan, which was deposited into an account in the name of the Jeff Kaplan Fake Identity controlled by SCHIFF, and that SCHIFF used the proceeds of this fraudulent transaction for the down payment on the Riverwoods Residence, as described above.

42.     It was further part of the scheme that SCHIFF never transferred title of the Lexus to the Sam Rosen Fake Identity and never added or caused to be added Digital Federal as a lienholder on the title to the Lexus.

43.     It was further part of the scheme that in or around June 2015, SCHIFF added or caused to be added as a lienholder to the title of the Lexus a company identified as "Solutions Auto Group Inc."

44.     It was further part of the scheme that in or around June 2015, SCHIFF caused Solutions Auto Group to sell the Lexus for approximately $34,000, with the

14

sales proceeds deposited into a bank account in the name of Solutions Auto Group, which was controlled by SCHIFF using the Yale Schiff Fake Identity, with none of the proceeds paid to Digital Federal.

### Fraudulently Obtained Lines of Credit

45. It was further part of the scheme that SCHIFF fraudulently obtained lines of credit from financial institutions using false information, including false identities, the proceeds of which he used for his and family members' expenses, then failed to pay the amounts due on the lines of credit.

46. It was further part of the scheme that in or around March 2015, SCHIFF, using the L.I. Stolen Identity, opened a line of credit at Navy Federal, which SCHIFF used to issue checks and make bank transfers to SCHIFF in his name and in the name of fake identities used by SCHIFF.

47. It was further part of the scheme that in or around April 2015, SCHIFF, using the Sam Rosen Fake Identity, opened a line of credit at Navy Federal, which SCHIFF used to issue checks to SCHIFF in his name and in the names of fake identities used by him, to C.S. and to I.S.

48. It was further part of the scheme that in or around February 2017, SCHIFF, using the Jeff Kaplan Fake Identity, opened a line of credit at Navy Federal, which SCHIFF used for his own benefit and to issue checks to I.S. and to A.S.

## Fraudulently Obtained Credit Card Accounts

49. It was further part of the scheme that SCHIFF fraudulently obtained from financial institutions credit card accounts using false information, including false identities, which he used for his and family members' personal expenses, and on which he left unpaid balances.

50. It was further part of the scheme that in or around April 2012, SCHIFF, using the Yale Schiff Fake Identity, obtained from Pentagon Federal a Visa credit card account ending in number 3001, which SCHIFF used to purchase personal items.

51. It was further part of the scheme that in or around May 2015, SCHIFF, using the Sam Rosen Fake Identity, obtained from Digital Federal a Visa credit card account ending in number 141, which SCHIFF used to obtain cash advances to fund checks payable to SCHIFF and SCHIFF's fake identities, and to make purchases for his own benefit.

52. It was further part of the scheme that in or around October 2015, SCHIFF, using the L.I. Stolen Identity, obtained from Comenity Bank a Visa credit card account ending in number 5121 and a Visa credit card account ending in number 1015, both of which SCHIFF used for transactions with companies controlled by SCHIFF or I.S. or A.S., for payments for storage space rented by SCHIFF or I.S., and for other purchases.

53. It was further part of the scheme that in or around February 2017, SCHIFF, using the Jeff Kaplan Fake Identity, obtained from Navy Federal a Visa

credit card account ending in number 1711, with SCHIFF as an authorized user, which SCHIFF used for cash advances and purchases.

54.     It was further part of the scheme that in or around February 2018, SCHIFF, using the J.G. Stolen Identity, obtained from Discover Bank a Discover credit card account ending in number 5818, which SCHIFF used to obtain, among other things, cash advances.

55.     It was further part of the scheme that in or around February 2018, SCHIFF and D.I., using the J.G. Stolen Identity, obtained from TD Bank a Nordstrom credit card account ending in number 7763, which SCHIFF and D.I. used for their own purchases at Nordstrom stores.

56.     It was further part of the scheme that SCHIFF misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the existence, purpose, and acts done in furtherance of the scheme.

57.     On or about November 2, 2009, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Wintrust Mortgage to issue loan proceeds to C.S. in the amount of approximately $188,250, to purchase the Adams Street Property;

In violation of Title 18, United States Code, Section 1344.

17

## COUNT TWO

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.    The allegations of paragraphs 1 through 56 of Count One are incorporated here.

2.    On or about June 9, 2015, in the Northern District of Illinois, Eastern Division, and elsewhere,

### YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Chase Bank to issue loan proceeds to C.S. in the amount of approximately $678,000, to purchase the Riverwoods Residence;

In violation of Title 18, United States Code, Section 1344.

## COUNT THREE

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 56 of Count One are incorporated here.

2.     On or about March 27, 2013, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing BMO Harris Bank to issue loan proceeds to the Yale Schiff Fake Identity in the amount of approximately $53,800 for the purchase of a 2014 Jeep Grand Cherokee;

In violation of Title 18, United States Code, Section 1344.

## COUNT FOUR

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 56 of Count One are incorporated here.

2.     On or about May 14, 2015, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Digital Federal to issue loan proceeds to the Sam Rosen Fake Identity in the amount of approximately $47,000 for the purchase of a Lexus RX350;

In violation of Title 18, United States Code, Section 1344.

## COUNT FIVE

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 56 of Count One are incorporated here.

2.     On or about March 13, 2015, in the Northern District of Illinois Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Navy Federal to open a line of credit in the name of the L.I. Stolen Identity;

In violation of Title 18, United States Code, Section 1344.

## COUNT SIX

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 56 of Count One are incorporated here.

2.     On or about April 28, 2015, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Navy Federal to open a line of credit in the name of the Sam Rosen Fake Identity;

In violation of Title 18, United States Code, Section 1344.

## **COUNT SEVEN**

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.    The allegations of paragraphs 1 through 56 of Count One are incorporated here.

2.    On or about February 14, 2017, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Navy Federal to open a line of credit in the name of the Jeff Kaplan Fake Identity;

In violation of Title 18, United States Code, Section 1344.

## COUNT EIGHT

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 56 of Count One are incorporated here.

2.     On or about May 11, 2015, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Digital Federal to open a Visa credit card account ending in number 141 in the name of the Sam Rosen Fake Identity;

In violation of Title 18, United States Code, Section 1344.

## COUNT NINE

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 56 of Count One are incorporated here.

2.     On or about October 21, 2015, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Comenity Bank to open a Visa credit card account ending in number 1015 in the name of the L.I. Stolen Identity;

In violation of Title 18, United States Code, Section 1344.

## COUNT TEN

The SPECIAL JANUARY 2019 GRAND JURY further charges:

On or about October 21, 2015, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, during and in relation to any felony, namely bank fraud as charged in Count Nine, did knowingly possess and use, without lawful authority, a means of identification of another person, namely the social security number of L.I.;

In violation of Title 18, United States Code, Section 1028A.

## COUNT ELEVEN

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.    The allegations of paragraphs 1 through 56 of Count One are incorporated here.

2.    On or about February 14, 2017, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Navy Federal to open a Visa credit card account ending in number 1711 in the name of the Jeff Kaplan Fake Identity;

In violation of Title 18, United States Code, Section 1344.

## **COUNT TWELVE**

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 56 of Count One are incorporated here.

2.     On or about February 14, 2018, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Discover Bank to open a Discover credit card account ending in number 5818 in the name of the J.G. Stolen Identity;

In violation of Title 18, United States Code, Section 1344.

## COUNT THIRTEEN

The SPECIAL JANUARY 2019 GRAND JURY further charges:

On or about February 14 2018, in the Northern District of Illinois, Eastern Division, and elsewhere,

### YALE SCHIFF,

defendant herein, during and in relation to any felony, namely bank fraud as charged in Count Twelve, did knowingly possess and use, without lawful authority, a means of identification of another person, namely the social security number of J.G.;

In violation of Title 18, United States Code, Section 1028A.

## FORFEITURE ALLEGATION

The SPECIAL JANUARY 2019 GRAND JURY alleges:

1.      Upon conviction of an offense in violation of Title 18, United States Code, Section 1344, as set forth in this Indictment, defendant shall forfeit to the United States of America any property which constitutes and is derived from proceeds obtained directly and indirectly as a result of the offense, as provided in Title 18, United States Code, Section 982(a)(2)(A).

2.      The property to be forfeited includes, but is not limited to:

    a.      a personal money judgment in the amount of approximately $4,700,000; and

    b.      the following specific property:

        i.      real property commonly known as 2460 Forest Glen Trail, Riverwoods, Illinois, legally described as follows:

> LOT 17 IN MITCHELL C. MACK'S DEERFIELD WOODLAND SUBDIVISION, BEING A SUBDIVISION OF PART OF THE SOUTHEAST ¼ OF SECTION 25, TOWNSHIP 43 NORTH, RANGE 11 EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED JUNE 15, 1956, AS DOCUMENT 912091 IN BOOK 33 OF PLATS, PAGE 99, IN LAKE COUNTY, ILLINOIS
> PIN: 15-25-407-023-0000

3.      If any of the property described above, as a result of any act or omission by defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the

United States of America shall be entitled to forfeiture of substitute property, as provided in Title 21, United States Code Section 853(p).

A TRUE BILL:

_____
FOREPERSON