**INTAKE**

JUL 25 2019

**RECEIVED**

JUL 24 2019

MAGISTRATE JUDGE
JEFFREY I. CUMMINGS

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 19 CR 474 |
| | ) | |
| v. | ) | Hon. Robert M. Dow, Jr. |
| | ) | |
| YALE SCHIFF and | ) | Violations: Title 18, United States |
| JASON SCHIFF | ) | Code, Sections 1344 and 1028A |
| | ) | |
| | ) | Superseding Indictment |

## COUNT ONE

**MAGISTRATE JUDGE KIM**

The SPECIAL JANUARY 2019 GRAND JURY charges:

1.      At times material to this Superseding Indictment:

a.      Defendant YALE SCHIFF was an individual residing in the Northern District of Illinois.

b.      Auto Title Loan Store of Illinois LLC (ATLSI) was a limited liability company incorporated in Illinois in or around 2003, with YALE SCHIFF as the sole manager, and involuntarily dissolved in or around 2012.

c.      Defendant JASON SCHIFF was YALE SCHIFF's brother and resided in the Northern District of Illinois.

d.      C.S. was YALE SCHIFF's relative, and the legal owner of the property located at 1000 W. Adams Street in Chicago, Illinois (Adams Street Property) and the property located at 2460 Forest Glen Trail in Riverwoods, Illinois (Riverwoods Residence).

**FILED**

JUL 24 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

e.      I.S. was a relative of YALE SCHIFF and JASON SCHIFF.

f.      A.S. was a relative of YALE SCHIFF and JASON SCHIFF.

g.     David Izsak was YALE SCHIFF's business associate.

h.     The Yale Schiff Fake Identity was an identity with the name Yale Schiff, a date of birth and a social security number that did not belong to YALE SCHIFF, and false employment and income information.

i.     The Jeff Kaplan Fake Identity was an identity with the name Jeff Kaplan, a social security number that belonged to a real person not named Jeff Kaplan, a date of birth not known to be associated with any person named Jeff Kaplan, and fictitious employment and income information.

j.     The Sam Rosen Fake Identity was an identity with the name Sam Rosen, a social security number that belonged to a real person not named Sam Rosen, a date of birth not known to be associated with any person named Sam Rosen, and fictitious employment and income information.

k.     The J.G. Stolen Identity was an identity with the name, date of birth, and social security number of J.G., a deceased real person known to YALE SCHIFF, and false employment and income information.

l.     The L.I. Stolen Identity was an identity with the name, date of birth, and social security number of L.I., a relative of David Izsak and a real person known to YALE SCHIFF, and false employment and income information.

m.     American Chartered Bank (American Chartered), Bank of America (BOA), Bank One, which was acquired by JP Morgan Chase Bank (Chase Bank) in or around 2004, BMO Harris Bank (BMO Harris), BMW Bank of North America (BMW Bank), Citibank N.A., Comenity Bank, Discover Bank, Fifth Third

2

Bank (Fifth Third), IndyMac Bank, GMAC Bank, Chase Bank, TD Bank, U.S. Bank National Association (U.S. Bank), and Washington Mutual Bank, which was acquired by Chase Bank in or around 2008 (WAMU), were financial institutions insured by the Federal Deposit Insurance Corporation. CitiMortgage, a mortgage lending business, was a subsidiary of Citibank N.A., an FDIC-insured financial institution. Wintrust Mortgage, a mortgage lending business, was a division of Barrington Bank & Trust Company N.A., an FDIC-insured financial institution. GMAC Mortgage was a mortgage lending business. Santander Consumer USA (Santander) was a North American subsidiary and branch of Banco Santander S.A., a foreign bank.

        n.     Digital Federal Credit Union (Digital Federal), Navy Federal Credit Union (Navy Federal), and Pentagon Federal Credit Union (Pentagon Federal) were financial institutions insured by the National Credit Union Administration.

        o.     Financial institutions, including those identified in the previous two subparagraphs, required loan and credit applicants to provide truthful information, including the applicant's identity, financial condition, employment, income, liabilities, source of down payment funds, and encumbrances on collateral, which was material to the financial institutions' approval, terms, and funding of loans and extension of credit.

        p.     Mortgage lenders often sold or assigned loans to other lenders and institutions (successors). Lenders disclosed that the loans could be sold or assigned

and the likelihood that the loans would be sold or assigned. The information provided in loan applications and supporting documents, including the borrower's identity, financial condition, employment, income, liabilities, and source of down payment funds, and encumbrances on collateral, was material to the successors' decision to acquire the loans.

2. Beginning in or around 2005 and continuing to in or around 2018, in the Northern District of Illinois, and elsewhere,

YALE SCHIFF and
JASON SCHIFF,

defendants herein, knowingly participated in a scheme to defraud a financial institution and to obtain money, funds, credits, assets and other property owned by and under the custody and control of a financial institution, by means of materially false and fraudulent pretenses, representations, and promises, and concealment of material facts, which scheme is further described in the following paragraphs.

3. It was part of the scheme that YALE SCHIFF and JASON SCHIFF fraudulently caused financial institutions to issue mortgage and vehicle loans, lines of credit, and credit card accounts in a total amount exceeding $5,000,000, by making materially false representations to, and by concealing material facts from, financial institutions regarding borrowers' qualifications and encumbrances on collateral.

4. It was further part of the scheme that YALE SCHIFF and JASON SCHIFF filed and caused the filing of false releases of mortgages and liens on real property and vehicles held as collateral for loans, thereby making it appear that the title to the collateral was free and clear and allowing YALE SCHIFF and JASON

SCHIFF to fraudulently obtain additional loan proceeds or to sell the collateral and retain the sales proceeds, without payment to prior lienholders.

5.     It was further part of the scheme that YALE SCHIFF fraudulently used fictitious identities, through combinations of names, including fake names such as Jeff Kaplan and Sam Rosen, social security numbers, and dates of birth, to obtain loans and credit from financial institutions. In connection with YALE SCHIFF's use of fictitious identities, YALE SCHIFF used a fake Illinois driver's license that bore the name Jeff Kaplan with YALE SCHIFF's likeness and an address of a residence previously used by YALE SCHIFF, and a fake Illinois driver's license that bore the name Sam Rosen with David Izsak's likeness and an address of a residence used by A.S.

6.     It was further part of the scheme that YALE SCHIFF and others fraudulently used the identities of other real persons, namely L.I. and J.G., without authorization from those persons, to obtain loans and credit from financial institutions.

## Fraudulently Obtained Mortgage Loans

7.     It was further part of the scheme that YALE SCHIFF and JASON SCHIFF fraudulently obtained mortgage loans through false statements in loan application materials and false releases of mortgages on the collateral.

### 910 W. Madison Street, Unit 802, Chicago

8.     It was further part of the scheme that, in or around June 2005, YALE SCHIFF filed or caused to be filed with the Cook County Recorder of Deeds a release

that falsely stated that a HELOC of approximately $292,000 that he previously had obtained from Bank One, secured by a property he owned at 910 W. Madison Street, Unit 302, Chicago, Illinois (Madison Street Property), was paid in full and that the lien was thereby released when, as YALE SCHIFF knew, the loan was not paid in full and the lien had not been released.

9.     In order to conceal the scheme, YALE SCHIFF continued to pay on the Bank One HELOC after he filed the false lien release.

10.     It was further part of the scheme that, in or around October 2005, JASON SCHIFF, using false information including false employment and income information, obtained two mortgage loans from CitiMortgage, including a loan for approximately $316,000, to finance his purchase of the Madison Street Property from YALE SCHIFF, secured by a mortgage on the Madison Street Property.

11.     It was further part of the scheme that, in or around October 2005, in connection with the sale of the Madison Street Property from YALE SCHIFF to JASON SCHIFF, YALE SCHIFF signed the HUD-1 Settlement Statement reflecting that a mortgage held by First American Bank of approximately $49,000 was the only mortgage on the Madison Street Property to be paid off when, as YALE SCHIFF knew, Bank One was a prior mortgagor on the Madison Street Property and the Bank One loan had not been paid off.

12.     It was further part of the scheme that, in or around October 2005, YALE SCHIFF sold the Madison Street Property to JASON SCHIFF for approximately $395,000, and caused most of the sales proceeds to be paid to YALE SCHIFF, some of

6

the sales proceeds to be paid to First American, and none of the sales proceeds to be paid to Bank One.

13. It was further part of the scheme that, in or around March 2009, JASON SCHIFF filed or caused to be filed with the Cook County Recorder of Deeds a release that falsely stated that the mortgage for approximately $316,000 held by CitiMortgage on the Madison Street Property was paid in full and that the lien was thereby released when, as JASON SCHIFF knew, the loan was not paid in full and the lien had not been released.

14. It was further part of the scheme that, in or around October 2009, JASON SCHIFF, using false information including false employment, income, and asset information, and false representations that there were no prior mortgages on the Madison Street Property, obtained from Fifth Third a HELOC in the amount of approximately $255,000, secured by a mortgage on the Madison Street Property.

15. It was further part of the scheme that, from in or around October 2009 through in or around November 2010, JASON SCHIFF obtained HELOC funds from Fifth Third, and during that time, made purported payments on the HELOC using fictitious checks to artificially inflate the amount of HELOC funds available.

16. It was further part of the scheme that JASON SCHIFF shared proceeds of the fraudulently obtained Fifth Third HELOC with YALE SCHIFF, C.S., and David Izsak.

<u>16 S. Aberdeen Street, Unit 9, Chicago</u>

17.     It was further part of the scheme that, in or around July 2005, YALE SCHIFF obtained from GMAC Bank a HELOC in the amount of approximately $125,000, secured by a property he owned located at 16 S. Aberdeen Street, Unit 9, Chicago, Illinois (Aberdeen Street Property).

18.     It was further part of the scheme that, in or around August 2005, YALE SCHIFF filed or caused to be filed with the Cook County Recorder of Deeds a release that falsely stated that the GMAC Bank HELOC was paid in full and that the lien was thereby released when, as YALE SCHIFF knew, the HELOC was not paid in full and the lien had not been released.

19.     In order to conceal the scheme, YALE SCHIFF continued to make payments on the GMAC Bank HELOC after he filed the false lien release.

20.     It was further part of the scheme that YALE SCHIFF fraudulently obtained other loans secured by the Aberdeen Street Property, including the following: (a) in or around July 2005, YALE SCHIFF obtained from Quicken Loans two refinancing loans for the Aberdeen Street Property, one for approximately $480,000 (subsequently assigned to IndyMac Bank) and a second for approximately $120,000 (subsequently assigned to BOA); (b) in or around December 2005, YALE SCHIFF obtained from BMO Harris a HELOC for approximately $385,000; and (c) in or around December 2006, YALE SCHIFF obtained from WAMU a HELOC for approximately $468,000.

21.     It was further part of the scheme that YALE SCHIFF obtained the loans described in the preceding paragraph through false information, including providing false income information in his loan application materials submitted to Quicken Loans and BMO Harris, and falsely stating in his loan application submitted to WAMU that certain loans were secured by other properties when, as YALE SCHIFF knew, those loans were secured by the Aberdeen Street Property.

22.     It was further part of the scheme that, on multiple occasions, YALE SCHIFF filed or caused to be filed with the Cook County Recorder of Deeds false documents purporting to release various mortgages and liens on the Aberdeen Street Property, and falsely claiming that various loans were paid in full, including: (a) in or around October 2005, a release that falsely stated that the Quicken Loans/IndyMac Bank loan was paid in full and that the Quicken Loans/IndyMac Bank lien on the Aberdeen Street Property was thereby released; (b) in or around April 2006, a release that falsely stated that the BMO Harris HELOC had been paid in full and that the BMO Harris lien on the Aberdeen Street Property was thereby released; (c) in or around November 2007, a release that falsely stated that the WAMU HELOC had been paid in full and that the WAMU HELOC lien on the Aberdeen Street Property was thereby released.

23.     It was further part of the scheme that, in or around August 2008, YALE SCHIFF sold the Aberdeen Street Property for approximately $525,000, and received approximately $484,000 in sale proceeds, which he kept for his own benefit, without paying off the outstanding loans secured by the Aberdeen Street Property.

24.     In order to conceal the scheme, YALE SCHIFF continued to make payments on certain of these loans after he filed the false lien releases, and on at least one loan after the sale of the Aberdeen Street Property.

### 1000 W. Adams Street, Unit 816, Chicago

25.     It was further part of the scheme that, in or around September 2006, YALE SCHIFF purchased the Adams Street Property for approximately $269,000, financed by a loan from Chicago Financial Services for approximately $242,000, using the Adams Street Property as collateral. Chicago Financial Services subsequently assigned service of the loan to GMAC Mortgage in or around November 2006.

26.     It was further part of the scheme that, in or around April 2009, YALE SCHIFF and C.S. formed the 1000 W. Adams LLC as the only two members and managers of the LLC, and YALE SCHIFF then transferred the Adams Street Property to the 1000 W. Adams LLC; then, in or around November 2009, the 1000 W. Adams LLC transferred the Adams Street Property to C.S.

27.     It was further part of the scheme that, in or around November 2009, YALE SCHIFF and C.S. obtained a loan in C.S.'s name from Wintrust Mortgage for approximately $188,250, using the Adams Street Property as collateral.

28.     It was further part of the scheme that, in or around November 2009, in response to a Wintrust Mortgage loan requirement that the Adams Street Property be "owned free and clear," YALE SCHIFF submitted or caused to be submitted to Wintrust Mortgage a fictitious letter purportedly from GMAC Mortgage to YALE SCHIFF referencing the prior mortgage on the Adams Street Property and stating,

"This is to confirm that your home mortgage loan with GMAC Mortgage has been paid in full and is now closed effective October 10, 2007," when, as YALE SCHIFF knew, the letter was not from GMAC Mortgage and the loan was not paid in full.

29.     It was further part of the scheme that, in or around November 2009, Wintrust Mortgage issued in excess of $160,000 in mortgage loan proceeds to C.S., who transferred approximately $122,000 of the loan proceeds to a bank account controlled by I.S., who then provided a portion of the loan proceeds to YALE SCHIFF.

## 2057 W. Ohio Street, Chicago

30.     It was further part of the scheme that, in or around April 2007, YALE SCHIFF fraudulently obtained from American Chartered a loan for approximately $375,000 to finance the purchase of the property located at 2057 W. Ohio Street, Chicago, Illinois (Ohio Street Property) from Ohio Development Group LLC, of which YALE SCHIFF was one of two managers/members, using that property as collateral, and by submitting false information to American Chartered, including a false representation that YALE SCHIFF had only one outstanding mortgage on the Aberdeen Street Property, the WAMU HELOC, when, as YALE SCHIFF knew, he had multiple outstanding loans secured by the Aberdeen Street Property, including the Quicken Loans/IndyMac Bank loan and the BMO Harris HELOC.

## 2460 Forest Glen Trail, Riverwoods

31.     It was further part of the scheme that, in or around June 2015, YALE SCHIFF and C.S. obtained from Chase Bank a loan in C.S.'s name for approximately $678,000 to purchase the Riverwoods Residence, secured by that same property.

32.     It was further part of the scheme that, in or around April 2015, as part of the loan application process, YALE SCHIFF falsely represented to Chase Bank that the Ohio Street Property did not have a mortgage on it when, as YALE SCHIFF knew, the Ohio Street Property had at least one mortgage.

33.     It was further part of the scheme that, in or around May 2015, YALE SCHIFF caused fraudulently obtained proceeds to be used to fund the down payment on the Riverwoods Residence.

34.     It was further part of the scheme that, in or around May 2015, YALE SCHIFF caused C.S. to falsely represent to Chase Bank that a portion of the down payment funds were a gift from a friend named Jeff Kaplan but were being returned, and to falsely represent that a portion of the down payment funds were from a personal property transaction with an individual named Sam Rosen but were being returned, and ultimately, to falsely represent that a portion of the down payment funds were a gift from I.S.

### Fraudulently Obtained Vehicle Loans

35.     It was further part of the scheme that YALE SCHIFF and JASON SCHIFF fraudulently obtained vehicle loans from financial institutions through false statements in vehicle loan applications and through fictitious releases falsely asserting that such loans had been paid in full.

36.     It was further part of the scheme that, in or around July 2009, JASON SCHIFF obtained a loan of approximately $50,000 from U.S. Bank to purchase a 2008 Porsche from YALE SCHIFF, secured by a lien on the vehicle.

37.     It was further part of the scheme that, in or around December 2009, JASON SCHIFF submitted or caused to be submitted to the Illinois Secretary of State a letter falsely purporting to be from U.S. Bank and falsely stating that the loan from U.S. Bank had been paid in full, and requesting that U.S. Bank be removed as a lienholder on the 2008 Porsche when, as JASON SCHIFF knew, the U.S. Bank loan had not been paid in full and the lien had not been released.

38.     It was further part of the scheme that, in or around May 2011, JASON SCHIFF submitted or caused to be submitted to the Illinois Secretary of State a request for a new title, adding ATLSI as a lienholder.

39.     It was further part of the scheme that, in or around June 2011, JASON SCHIFF and YALE SCHIFF caused the 2008 Porsche to be sold and sales proceeds of approximately $64,830 to be deposited into an ATLSI bank account controlled by YALE SCHIFF, with no payment to U.S. Bank.

40.     It was further part of the scheme that, in or around April 2010, JASON SCHIFF, using false employment and income information, obtained a loan of approximately $76,000 from Chase Bank to purchase a 2009 Land Rover, secured by a lien on the vehicle.

41.     It was further part of the scheme that, in or around October 2010, JASON SCHIFF submitted or caused to be submitted to the Illinois Secretary of State a letter falsely purporting to be from Chase Bank and falsely stating that the loan from Chase Bank had been paid in full, and requesting that Chase Bank be removed

as a lienholder on the 2009 Land Rover when, as JASON SCHIFF knew, the Chase Bank loan had not been paid in full and the lien had not been released.

42.     It was further part of the scheme that, in or around April 2011, JASON SCHIFF submitted or caused to be submitted to the Illinois Secretary of State an installment contract claiming that JASON SCHIFF owed a debt to ATLSI, secured by the 2009 Land Rover, and requesting that ATLSI be added as a lienholder on the Land Rover.

43.     It was further part of the scheme that, in or around May 2011, ATLSI sold the 2009 Land Rover, with the sales proceeds deposited in a bank account controlled by YALE SCHIFF, who shared some of the sales proceeds with JASON SCHIFF, without paying off the Chase Bank loan.

44.     It was further part of the scheme that, in or around March 2013, YALE SCHIFF, using the Yale Schiff Fake Identity, obtained a loan of approximately $53,800 from BMO Harris to purchase a 2014 Jeep Grand Cherokee, secured by a lien on the vehicle.

45.     It was further part of the scheme that, in or around June 2014, YALE SCHIFF submitted or caused to be submitted a letter to the Illinois Secretary of State falsely purporting to be from BMO Harris and falsely stating that the BMO Harris loan was paid in full, and requesting that the Illinois Secretary of State issue a duplicate and corrected title that removed BMO Harris as the lienholder on the 2014 Jeep Grand Cherokee when, as YALE SCHIFF knew, the BMO Harris loan had not been paid in full and the lien had not been released.

14

46.     It was further part of the scheme that, in or around June 2014, YALE SCHIFF caused a company named Funding Choices to be added as a lienholder on the fraudulently obtained duplicate title for the 2014 Jeep Grand Cherokee, then caused Funding Choices to sell the vehicle for approximately $41,000 and deposited the sale proceeds into a bank account controlled by YALE SCHIFF.

47.     It was further part of the scheme that, in or around May 2015, YALE SCHIFF, using the Sam Rosen Fake Identity, including the fake Illinois driver's license associated with that identity bearing a likeness of David Izsak, obtained from Digital Federal a loan of approximately $47,000 to purchase a 2015 Lexus RX350 from the Jeff Kaplan Fake Identity, secured by a lien on the vehicle.

48.     It was further part of the scheme that, in or around May 2015, Digital Federal issued the loan proceeds for the purchase of the 2015 Lexus RX350 to the Sam Rosen Fake Identity by a check for $47,000 made payable to Jeff Kaplan, which was deposited into an account in the name of the Jeff Kaplan Fake Identity controlled by YALE SCHIFF, who used the proceeds of this fraudulent transaction for the down payment on the Riverwoods Residence, as described above.

49.     It was further part of the scheme that YALE SCHIFF never transferred title of the 2015 Lexus RX350 to the Sam Rosen Fake Identity and never added or caused to be added Digital Federal as a lienholder on the title.

50.     It was further part of the scheme that, in or around June 2015, YALE SCHIFF added or caused to be added as a lienholder to the title of the 2015 Lexus RX350 a company identified as Solutions Auto Group.

51. It was further part of the scheme that, in or around June 2015, YALE SCHIFF caused Solutions Auto Group to sell the 2015 Lexus RX350 for approximately $34,000, with the sales proceeds deposited into a bank account in the name of Solutions Auto Group, which was controlled by YALE SCHIFF using the Yale Schiff Fake Identity, with none of the proceeds paid to Digital Federal.

52. It was further part of the scheme that, in or around February 2017, JASON SCHIFF, using false employment and income information, obtained a loan for approximately $43,000 from Santander to purchase a 2017 Toyota Sienna, secured by a lien on the vehicle.

53. It was further part of the scheme that, in or around February 2017, YALE SCHIFF, using the Jeff Kaplan Fake Identity, obtained a loan of approximately $92,000 from BMW Bank to purchase a 2017 BMW X5 in the name of Jeff Kaplan and Axis Development Corp, secured by a lien on the vehicle.

54. It was further part of the scheme that, in or around May 2017, YALE SCHIFF submitted or caused to be submitted to the Illinois Secretary of State a letter falsely purporting to be from BMW Bank and falsely stating that the loan from BMW Bank had been paid in full and requesting that BMW Bank be removed as a lienholder on the title of the 2017 BMW X5 when, as YALE SCHIFF knew, the BMW Bank loan had not been paid in full and the lien had not been released.

55. It was further part of the scheme that, in or around June 2017, YALE SCHIFF attempted to sell the 2017 BMW X5 at an auction, but BMW Bank prevented the sale and recouped the vehicle.

56.     It was further part of the scheme that, in or around October 2018, JASON SCHIFF as the owner of Company A and YALE SCHIFF as a manager of Company A and as a guarantor, using false information including false income information of YALE SCHIFF and a misrepresentation that YALE SCHIFF had never filed for bankruptcy, purchased a 2018 BMW X5 in the name of Company A with financing for approximately $84,000 from BMW Bank, secured by a lien on the vehicle. The loan is in default.

## Fraudulently Obtained Lines of Credit

57.     It was further part of the scheme that YALE SCHIFF fraudulently obtained lines of credit from financial institutions using false information, including false identities, the proceeds of which he used for his and family members' expenses, then failed to pay the amounts due on the lines of credit.

58.     It was further part of the scheme that, in or around March 2015, YALE SCHIFF, using the L.I. Stolen Identity, opened a line of credit at Navy Federal, which YALE SCHIFF used to issue checks and transfer funds to YALE SCHIFF in his name and in the name of fake identities used by YALE SCHIFF.

59.     It was further part of the scheme that, in or around April 2015, YALE SCHIFF, using the Sam Rosen Fake Identity, opened a line of credit at Navy Federal, which YALE SCHIFF used to issue checks to YALE SCHIFF in his name and in the names of fake identities used by him, to C.S., and to I.S.

60.     It was further part of the scheme that, in or around February 2017, YALE SCHIFF, using the Jeff Kaplan Fake Identity, opened a line of credit at Navy

Federal, which YALE SCHIFF used for his own benefit and to issue checks to I.S. and to A.S.

## Fraudulently Obtained Credit Card Accounts

61.     It was further part of the scheme that YALE SCHIFF fraudulently obtained from financial institutions credit card accounts using false information, including false identities, which he used for his and family members' expenses, and on which he left unpaid balances.

62.     It was further part of the scheme that, in or around April 2012, YALE SCHIFF, using the Yale Schiff Fake Identity, obtained from Pentagon Federal a Visa credit card account ending in number 3001, which YALE SCHIFF used for his own benefit.

63.     It was further part of the scheme that, in or around May 2015, YALE SCHIFF, using the Sam Rosen Fake Identity, obtained from Digital Federal a Visa credit card account ending in number 141, which YALE SCHIFF used for his own benefit, including to obtain cash advances to fund checks payable to YALE SCHIFF and YALE SCHIFF's fake identities.

64.     It was further part of the scheme that, in or around October 2015, YALE SCHIFF, using the L.I. Stolen Identity, obtained from Comenity Bank a Visa credit card account ending in number 5121 and a Visa credit card account ending in number 1015, both of which YALE SCHIFF used for his own benefit.

65.     It was further part of the scheme that, in or around February 2017, YALE SCHIFF, using the Jeff Kaplan Fake Identity, obtained from Navy Federal a

Visa credit card account ending in number 1711, with YALE SCHIFF as an authorized user, which YALE SCHIFF used for his own benefit.

66.     It was further part of the scheme that, in or around February 2018, YALE SCHIFF, using the J.G. Stolen Identity, obtained from Discover Bank a Discover credit card account ending in number 5818, which YALE SCHIFF used for his own benefit.

67.     It was further part of the scheme that, in or around February 2018, YALE SCHIFF and David Izsak, using the J.G. Stolen Identity, obtained from TD Bank a Nordstrom credit card account ending in number 7763, which YALE SCHIFF and David Izsak used for their own benefit.

68.     It was further part of the scheme that YALE SCHIFF and JASON SCHIFF misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the existence, purposes, and acts done in furtherance of the scheme.

69.     On or about October 28, 2009, in the Northern District of Illinois, Eastern Division, and elsewhere,

JASON SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Fifth Third to open a HELOC in the name of JASON SCHIFF in the amount of approximately $255,000;

In violation of Title 18, United States Code, Section 1344.

## COUNT TWO

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 68 of Count One are incorporated here.

2.     On or about November 2, 2009, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Wintrust Mortgage to issue loan proceeds to C.S. in the amount of approximately $188,250, to purchase the Adams Street Property;

In violation of Title 18, United States Code, Section 1344.

## COUNT THREE

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1. The allegations of paragraphs 1 through 68 of Count One are incorporated here.

2. On or about June 9, 2015, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Chase Bank to issue loan proceeds to C.S. in the amount of approximately $678,000, to purchase the Riverwoods Residence;

In violation of Title 18, United States Code, Section 1344.

## COUNT FOUR

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.    The allegations of paragraphs 1 through 68 of Count One are incorporated here.

2.    On or about July 24, 2009, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF and
JASON SCHIFF,

defendants herein, knowingly executed and attempted to execute the above-described scheme by causing U.S. Bank to issue loan proceeds to JASON SCHIFF in the amount of approximately $50,000 for the purchase of a 2008 Porsche;

In violation of Title 18, United States Code, Section 1344.

## COUNT FIVE

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 68 of Count One are incorporated here.

2.     On or about April 30, 2010, in the Northern District of Illinois, Eastern Division, and elsewhere,

JASON SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Chase Bank to issue loan proceeds to JASON SCHIFF in the amount of approximately $76,000 for the purchase of a 2009 Land Rover;

In violation of Title 18, United States Code, Section 1344.

## COUNT SIX

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 68 of Count One are incorporated here.

2.     On or about March 27, 2013, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing BMO Harris to issue loan proceeds to the Yale Schiff Fake Identity in the amount of approximately $53,800 for the purchase of a 2014 Jeep Grand Cherokee;

In violation of Title 18, United States Code, Section 1344.

## COUNT SEVEN

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.      The allegations of paragraphs 1 through 68 of Count One are incorporated here.

2.      On or about May 14, 2015, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Digital Federal to issue loan proceeds to the Sam Rosen Fake Identity in the amount of approximately $47,000 for the purchase of a Lexus RX350;

In violation of Title 18, United States Code, Section 1344.

## COUNT EIGHT

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 68 of Count One are incorporated here.

2.     On or about March 13, 2015, in the Northern District of Illinois Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Navy Federal to open a line of credit in the name of the L.I. Stolen Identity;

In violation of Title 18, United States Code, Section 1344.

## COUNT NINE

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 68 of Count One are incorporated here.

2.     On or about April 28, 2015, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Navy Federal to open a line of credit in the name of the Sam Rosen Fake Identity;

In violation of Title 18, United States Code, Section 1344.

## COUNT TEN

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 68 of Count One are incorporated here.

2.     On or about February 14, 2017, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Navy Federal to open a line of credit in the name of the Jeff Kaplan Fake Identity;

In violation of Title 18, United States Code, Section 1344.

## COUNT ELEVEN

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 68 of Count One are incorporated here.

2.     On or about May 11, 2015, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Digital Federal to open a Visa credit card account ending in number 141 in the name of the Sam Rosen Fake Identity;

In violation of Title 18, United States Code, Section 1344.

## COUNT TWELVE

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 68 of Count One are incorporated here.

2.     On or about October 21, 2015, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Comenity Bank to open a Visa credit card account ending in number 1015 in the name of the L.I. Stolen Identity;

In violation of Title 18, United States Code, Section 1344.

## COUNT THIRTEEN

The SPECIAL JANUARY 2019 GRAND JURY further charges:

On or about October 21, 2015, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, during and in relation to any felony, namely bank fraud as charged in Count Twelve, did knowingly possess and use, without lawful authority, a means of identification of another person, namely the social security number of L.I.;

In violation of Title 18, United States Code, Section 1028A.

## COUNT FOURTEEN

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.      The allegations of paragraphs 1 through 68 of Count One are incorporated here.

2.      On or about February 14, 2017, in the Northern District of Illinois, Eastern Division, and elsewhere,

### YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Navy Federal to open a Visa credit card account ending in number 1711 in the name of the Jeff Kaplan Fake Identity;

In violation of Title 18, United States Code, Section 1344.

## **COUNT FIFTEEN**

The SPECIAL JANUARY 2019 GRAND JURY further charges:

1.     The allegations of paragraphs 1 through 68 of Count One are incorporated here.

2.     On or about February 14, 2018, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, knowingly executed and attempted to execute the above-described scheme by causing Discover Bank to open a Discover credit card account ending in number 5818 in the name of the J.G. Stolen Identity;

In violation of Title 18, United States Code, Section 1344.

## COUNT SIXTEEN

The SPECIAL JANUARY 2019 GRAND JURY further charges:

On or about February 14 2018, in the Northern District of Illinois, Eastern Division, and elsewhere,

YALE SCHIFF,

defendant herein, during and in relation to any felony, namely bank fraud as charged in Count Fifteen, did knowingly possess and use, without lawful authority, a means of identification of another person, namely the social security number of J.G.;

In violation of Title 18, United States Code, Section 1028A.

## FORFEITURE ALLEGATION

The SPECIAL JANUARY 2019 GRAND JURY alleges:

1.     Upon conviction of an offense in violation of Title 18, United States Code, Section 1344, as set forth in this Indictment, defendants shall forfeit to the United States of America any property which constitutes and is derived from proceeds obtained directly and indirectly as a result of the offense, as provided in Title 18, United States Code, Section 982(a)(2)(A).

2.     The property to be forfeited includes, but is not limited to:

    a.     with respect to both defendants, a personal money judgment in the amount of approximately $4,900,000; and

    b.     with respect to defendant YALE SCHIFF, the following specific property:

        i.     real property commonly known as 2460 Forest Glen Trail, Riverwoods, Illinois, legally described as follows:

> LOT 17 IN MITCHELL C. MACK'S DEERFIELD WOODLAND SUBDIVISION, BEING A SUBDIVISION OF PART OF THE SOUTHEAST ¼ OF SECTION 25, TOWNSHIP 43 NORTH, RANGE 11 EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED JUNE 15, 1956, AS DOCUMENT 912091 IN BOOK 33 OF PLATS, PAGE 99, IN LAKE COUNTY, ILLINOIS
> PIN: 15-25-407-023-0000

3.     If any of the property described above, as a result of any act or omission by defendants: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the

United States of America shall be entitled to forfeiture of substitute property, as provided in Title 21, United States Code Section 853(p).

A TRUE BILL:

_____
FOREPERSON

_____
UNITED STATES ATTORNEY